UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

SOULEYMANE M'BAYE,                          :

                    Plaintiff,              :         **OPINION**

            - against -                     :         05 Civ. 9581 (DC)

WORLD BOXING ASSOCIATION,                   :

                    Defendant.              :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**    (see last page)

**CHIN, D.J.**

            Plaintiff Souleymane M'Baye, a professional boxer,
brings this action for breach of contract and declaratory relief
against defendant the World Boxing Association (the "WBA").
M'Baye contends that the WBA breached its own rules governing the
ranking of fighters and the sanctioning of bouts, to his
detriment.  He moves for preliminary injunctive relief.

            The Court conducted a hearing on the motion on February
22 and 23, 2006, as the parties presented evidence and argument.
For the reasons set forth below, the motion is granted in part
and denied in part.  Pursuant to Federal Rule of Civil Procedure
65, my findings of fact and conclusions of law follow.

<h2 style="text-align:center">FINDINGS OF FACT</h2>

**A.    The WBA and Its Rules**

            The WBA is one of the major sanctioning organizations
in professional boxing; the others are the International Boxing

Federation (the "IBF"), the World Boxing Council (the "WBC"), and the World Boxing Organization (the "WBO"). (See Tr. 100).[1] The WBA ranks boxers in various weight categories, including the super lightweight division (140 pounds), the division principally at issue in this case. The WBA also sanctions championship and other bouts. (McAleenan Decl. ¶ 5). To that end, the WBA has promulgated a set of rules and regulations "to guarantee its efficiency and uniformity[,] to approve boxing matches under its control, and to regulate any other matter related to boxing." (WBA Rule 1.2).[2]

The WBA Rules recognize two levels of "champion" in each weight class, a "regular champion" and a "super champion."[3] A super champion is created when the regular champion defeats the champion of another sanctioning organization to become the champion of more than one sanctioning body at the same time.

_____

[1]     Reference to "Tr." are to the transcript of the hearing held on February 22-23, 2006.

[2]     The WBA rules are included in the record as Plaintiff's Exhibit ("Pl. Ex.") 1.

[3]     The term "super champion" actually encompasses three different "champions." As the WBA Rules explain, "[t]he [WBA] will grant the recognition of UNIFIED, UNDISPUTED, or SUPER CHAMPION to those WBA champions who are also accredited as world champion of the same division by more than one Boxing organization recognized by the WBA, such as the [WBC, IBF, and WBO]." (WBA Rule 5.2.1.1). A "Unified Champion" is one that holds the title of the WBA and one other sanctioning organization. (WBA Rule 5.2.2). An "Undisputed Champion" holds the title of at least three sanctioning organizations. (Id.). A "Super Champion" holds the title of at least four sanctioning organizations. (Id.). For ease of reference I will refer to these three categories collectively as "super champions," except as otherwise specified.

When this occurs, the regular WBA championship becomes vacant. (WBA Rule 5.2.1.3). Lower-ranked WBA boxers then fight each other for the vacant regular championship, and the net result is that at times there are two WBA "champions" -- one regular champion and one super champion. It is generally accepted that when there is both a regular champion and a super champion, the super champion is viewed as the true WBA champion, and the regular championship, though not worthless, is worth significantly less than it would otherwise be worth. (See, e.g., Pl. Ex. 10 (letter from counsel for Vivian Harris to WBA indicating Harris's position that "there is little point in being a champion in a division when there is a superchampion . . . because the general public considers the superchampion to be the 'real champion'"); see also Tr. 146).

WBA champions and super champions operate under a complex set of rules that govern when they have to make mandatory title defenses. As a general matter, WBA regular champions must make regular title defenses within predetermined time parameters against whoever is rated as the "Official Contender." The Official Contender, sometimes also known as a "Mandatory," is determined by the winner of an "elimination bout." WBA Rule 9.3.1 provides: "The Championships Chairman . . . will notify the two highest ranked available contenders of the obligation to meet in a twelve (12) round elimination bout toward mandatorily boxing the Champion." One consequence of a champion failing to defend his title against the Official Contender within the required time

period is that he may be stripped of his championship belt.  (See WBA Rule 9.2(b) ("A Champion's failure to comply with this obligation [to fight the Official Challenger] will be sufficient cause to . . . consider withdrawing recognition of the title.")).

A super champion need only defend against the WBA regular champion, and the time period within which he must make a mandatory defense is much longer than that of a regular champion. (See WBA Rule 5.2.2).  A Unified Champion need only defend his Unified Championship against the WBA regular champion once every eighteen months, an Undisputed Champion once every twenty-one months, and a Super Champion once every twenty-four months. (Id.).  By contrast, a regular champion typically must defend against the Official Contender within 120 days of winning the title and every nine months thereafter.  (See WBA Rules 5.1.3; 5.1.4).

Fighters pay fees to the WBA to sanction fights, and the WBA also receives a tax from the revenues earned from WBA-sanctioned bouts.  (Tr. 98; WBA Rules 5.2.3, 6.6, 9.4, 14).

## B.   **M'Baye**

M'Baye is a professional boxer who was born and lives in France.  (Tr. 88, 90, 91).  He is thirty-one years old.  (Tr. 93).  He started his boxing career in kickboxing, becoming the kickboxing champion of both France and Europe, at the age of seventeen.  (Tr. 91-92).  He eventually converted to English-style boxing and turned professional in September 1998.  (Tr. 92, 94-95).  He won the French championship in 2001 and as of the

time of the hearing his professional fight record was thirty-three victories and one defeat.  (Tr. 94-95).  In 2002, he became the European champion in the 140-pound class.  (Tr. 96).

## C.    The Super Lightweight Division

This dispute has its genesis in April 2002, when, in the WBA super lightweight division, a fighter named Kostya Tszyu was the super champion, the regular championship was vacant, and M'Baye was ranked number seven.  (Pl. Ex. 3).  In the months thereafter, (1) Diosbelys Hurtado became the WBA regular champion after he defeated a fighter named Randall Bailey for the vacant championship (Pl. Ex. 4); and (2) M'Baye became the Official Contender when he defeated a boxer named Khalid Rahilou.  (Tr. 97, 100; Pl. Exs. 4-5).  Under Rule 5.1.3, therefore, M'Baye was entitled to fight Hurtado by September 11, 2002, for the regular championship.  (Tr. 102).  For reasons that are unclear, however, the WBA granted an exception and allowed Hurtado instead to box a fighter named Vivian Harris, who was ranked fifteenth.  (Id.; Pl. Ex. 6).  Hence, M'Baye was passed over for a championship match, despite having paid sanctioning fees for the right to fight to be the Official Contender.  (See Tr. 98).

Harris defeated Hurtado to win the regular championship, and thereafter, on July 12, 2003, M'Baye -- in his lone shot at the championship -- fought Harris and lost a unanimous decision.  (Tr. 102).  That was the only loss of M'Baye's professional career.  (Tr. 102).  Harris's promoter was a company called Main Events.  (Compl. ¶ 30).

After winning two fights to move back up the WBA
rankings, on October 21, 2004, M'Baye once again became the WBA's
Official Contender after he won an elimination bout, for which he
paid the WBA a sanctioning fee, against a boxer named Andreas
Kotelnik.  (Tr. 103; Pl. Exs. 12, 13).  As the Official
Contender, M'Baye should have been granted a fight against
Harris, but once again the WBA granted an exception and allowed
Harris in June 2005 to fight Carlos Maussa instead.  (Tr. 105;
Pl. Ex. 14).[4]

Maussa had been rated sixth by the WBA as of November
2004 (when M'Baye was ranked first), but was removed from the
ratings by December 2004 after losing to a previously unranked
boxer.  (Pl. Exs. 15-16).  He remained unranked for several
months thereafter until April 2005, when he suddenly appeared in
the WBA rankings as number fifteen, despite having fought only
one fight in the interim against a boxer who was previously 0-0.
(Pl. Exs. 20, 22).[5]

Maussa defeated Harris on June 25, 2005, and became the
WBA regular champion in the super lightweight division.  (Tr.

---

[4]    In or around June 2004, the WBA stripped Tszyu of his
super championship for failing to meet his mandatory fight
obligations.  Thus, in October 2004 Harris was the regular
champion with no super champion over him.  (See Compl. Ex. J).

[5]    In a document received into evidence entitled "WBA
April 2005 Ratings Movements," the WBA explained that Maussa
entered the ratings at fifteen "as he will fight Vivian Harris on
June 25."  (Pl. Ex. 24).  In other words, it appears that the
sole reason Maussa was ranked fifteenth was to comply with the
WBA rule that requires championship defenses to be made against
ranked boxers.

105).  This was the second time M'Baye was passed over for a title shot, despite having paid sanctioning fees to be ranked the Official Contender.  Maussa's promoter was also Main Events. (Pl. Ex. 33).

When Maussa defeated Harris, M'Baye was still the Official Contender.  Maussa's mandatory defense against M'Baye was governed by Rule 5.1.4, which provides:

> A rated boxer who wins the World Title in any division between Minimum and Cruiserweight [which includes the super lightweight division] . . . who has not been certified as the Official or Mandatory Challenger of his division, <u>must defend his title against the Official Contender of his category within no more than [120] days</u> counted from the date on which he obtained the title.  From then onwards he shall defend his title at intervals no longer than [9] months against the Official Contender, <u>unless he is granted an exception according to what is stipulated under the Rule 19 of these Regulations</u>.

(WBA Rule 5.1.4 (emphasis added)).  Thus, Maussa was required to fight M'Baye no later than October 23, 2005, which was 120 days after June 25, 2005.[6]

The last sentence of the above-quoted portion of Rule 5.1.4 refers to Rule 19.  Rule 19.2 permits WBA champions to apply for special permits or exceptions.  It provides, in pertinent part, as follows:

---

[6]     Indeed, the WBA conceded as much in a letter to M'Baye's counsel dated October 7, 2005, in which Robert Mack, Legal Director for the WBA, wrote that "[i]t is my understanding that Mr. Maussa obtained his current title on June 25, 2005. Because he was not the mandatory or official contender at the time of that bout, his required mandatory of that title was due by October 23, 2005."  (Pl. Ex. 41).

> Any World Champion who is recognized by the
> [WBA] may request through the World
> Championship Committee, a special permit or
> exception for the following:
>
> . . .
>
> 3.   To unify the World title, with a title
> in a similar category of another entity.
>
> . . .
>
> 5.   To carry out a fight of importance and
> significance for the boxing world, at which
> the presence of the [WBA] is desirable.

## D.   <u>The Maussa/Hatton Fight</u>

On September 12, 2005, an IBF super lightweight, Ricky Hatton, announced that he would be fighting a unification bout against Maussa in November 2005.  (<u>See</u> Pl. Ex. 29).  M'Baye's representatives immediately and repeatedly objected to the WBA, noting that M'Baye was the mandatory challenger and therefore was entitled to fight Maussa for the WBA super lightweight title. (<u>See</u> Pl. Exs. 29, 30, 31, 34, 40; Tr. 106).

On September 22, 2005, Maussa's promoter -- Main Events -- sent an e-mail to the President of the WBA requesting a special permit pursuant to Rules 19.2.3 and 19.2.5 to grant an exception to allow Maussa to fight Hatton to create a Unified Champion.  (Pl. Ex. 33; <u>see also</u> Pl. Ex. 36).  By the very next day, the WBA was able to convene a vote of the seven-member Championships Committee, which unanimously voted to grant the special permit.  (Pl. Ex. 37).

Although M'Baye had been objecting to the proposed Maussa/Hatton fight since September 12, 2005, the WBA did not

inform M'Baye that it had granted the special permit until
October 7, 2005, two weeks after its decision.  (Pl. Exs. 40-41).
M'Baye commenced an administrative procedure before the WBA to
challenge the decision on October 12, 2005.  Although it took the
WBA only one day to grant Maussa's request for an exception,
M'Baye's appeal lingered for nearly a month and was not decided
until November 8, 2005.  The appeal was denied, only eighteen
days before the Maussa/Hatton fight was scheduled to take place.
(Pl. Ex. 50).

On November 26, 2005, Hatton defeated Maussa to become
the new WBA Unified Champion.

**E.   Hatton Relinquishes His Title**

On May 1, 2006, the WBA informed the Court that Hatton
has vacated his super lightweight championship and is now seeking
to be ranked in the welterweight class (147 pounds), and on May
4, 2006, the WBA provided the Court with a letter signed by
Hatton to that effect.  Hatton is scheduled to fight WBA
welterweight champion Luis Collazo on May 13, 2006.  Based on
this development, the WBA's position is that because Hatton has
vacated his WBA title, there is no super champion in the super
lightweight class, the regular championship remains vacant, and,
under the WBA rules, M'Baye (as the Official Contender) should
fight the next available ranked boxer, with the winner becoming
the WBA regular champion in the super lightweight division.

**PROCEDURAL HISTORY**

On November 9, 2005, the day after the WBA denied his administrative appeal, M'Baye commenced this action against the WBA in the Supreme Court of the State of New York, New York County. The WBA removed the case to this Court on November 14, 2005, based on diversity of the parties, as M'Baye is a citizen of France and the WBA is a not-for-profit corporation incorporated in Pennsylvania, with its principal place of business in Venezuela. (Notice of Removal ¶¶ 7, 8).[7]

M'Baye asserted various causes of action against the WBA and sought a temporary restraining order and preliminary injunction preventing the WBA from sanctioning the Maussa/Hatton fight scheduled for November 26, 2005. The Court heard oral argument on November 17 and 18, 2005, and, on November 21, 2005, issued an order (the "TRO") that (a) denied M'Baye's request to enjoin the WBA from sanctioning the Maussa-Hatton fight, and (b) temporarily enjoined the WBA from sanctioning any bout between the winner of the Maussa/Hatton fight and anyone other than M'Baye, unless M'Baye were first offered the fight and declined. (See Nov. 21, 2005, Order). Hatton and Maussa had both been granted leave to intervene as defendants, as they had wanted to oppose the application to enjoin the WBA from sanctioning their

---

[7] The Court raised the issue of subject matter jurisdiction, as the WBA's principal place of business was in a foreign country. The parties agreed that the Court had subject matter jurisdiction, and eventually the Court was so persuaded. (See 11/18/06 Tr. 2).

fight.

As noted above, Hatton won the fight.  Because Maussa
lost, he no longer had an interest in the case and he requested
and was granted leave to withdraw as an intervenor.  (See
December 2, 2005, Order).

On January 20, 2006, the TRO was converted to a
preliminary injunction and a trial on the merits was scheduled
for February 21, 2006.  (See January 20, 2006, Order).  On
February 9, 2006, M'Baye filed an amended complaint that included
claims against the WBA and added claims against Hatton.

At a pretrial conference, the trial on the merits was
adjourned until the summer.  Although M'Baye had previously been
content to convert the TRO to a preliminary injunction when the
trial on the merits had been scheduled for February, with the
adjournment of the trial he pressed his request for a broader
preliminary injunction.  Accordingly, the Court decided to
proceed with a hearing on M'Baye's motion for a preliminary
injunction on February 22-23, 2006.

Hatton moved to dismiss, arguing that M'Baye's
assertion of claims against him destroyed subject matter
jurisdiction, as Hatton was also a foreign citizen and therefore
plaintiff and one defendant were foreign citizens.  (See Tr. 2).
At the start of the hearing on February 22, 2006, the Court
granted M'Baye's application to withdraw his amended complaint
and Hatton's request, over M'Baye's objection, to withdraw as an
intervenor.  Hatton agreed that he would not contest any ruling

by the Court that might impact his obligation to defend his WBA title (which he had not yet relinquished) and the WBA agreed not to argue that Hatton was an indispensable party.  (Tr. 17, 29).

As a consequence of the withdrawal of the amended complaint and Hatton's withdrawal of his intervention, the parties were restored to their original posture, with M'Baye, a French citizen, as plaintiff, and the WBA, a Pennsylvania not-for-profit, as the sole defendant.  Hence, the objection to subject matter jurisdiction was obviated.

M'Baye sought an order requiring the WBA to mandate a championship bout between M'Baye and Hatton, with the condition that if Hatton refused to fight M'Baye he would be stripped of his WBA Unified Championship and M'Baye would be given the opportunity to fight for the vacant regular championship.  (Tr. 31).

In the meantime, the WBA had moved to dismiss the complaint for lack of personal jurisdiction and insufficient service of process.  The Court denied the motion in a memorandum decision dated April 28, 2006.  <u>M'Baye v. World Boxing Ass'n</u>, No. 05 Civ. 9581 (DC), 2006 WL 1120597 (S.D.N.Y. Apr. 28, 2006).

After the hearing but before this Court could rule on M'Baye's motion for a preliminary injunction, Hatton relinquished his WBA super lightweight title, as noted above, announcing his intention to move up to the welterweight division.

M'Baye asks the Court to enjoin the WBA from sanctioning the Hatton/Collazo bout (or any other bout involving

-12-

Hatton) as a welterweight championship bout unless the WBA conditions sanctioning of such a bought upon Hatton agreeing to fight M'Baye for the WBA super lightweight championship no later than September 15, 2006. Alternatively, he asks the Court to enjoin the WBA from sanctioning the Hatton/Collazo bout unless (a) Hatton agrees that he will fight no one else other than M'Baye or the WBA champion (if M'Baye lost a fight for the vacant regular championship) if Hatton returns to fight in the super lightweight division, and (b) Hatton notifies the WBA of his intention with respect to what weight class he will fight in no later than May 31, 2006.

## DISCUSSION and CONCLUSIONS OF LAW

### A. Applicable Law

#### 1. Preliminary Injunctions

To prevail on a motion for a preliminary injunction, the moving party must demonstrate a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits to make them fair grounds for litigation, as well as a balance of hardships tipping decidedly in the moving party's favor. See, e.g., Time Warner Cable v. Bloomberg L.P., 118 F.3d 917, 923 (2d Cir. 1997). Irreparable injury exists where, but for the granting of the preliminary injunction, it would be difficult or impossible to return the parties to the positions they previously occupied. See Brenntag Int'l Chems., Inc. v. Bank of India, 175 F.3d 245, 249 (2d Cir. 1999).

A trial court has discretion to fashion a preliminary injunction that will preserve the status quo pending a trial on the merits. Arthur Guinness & Sons, PLC v. Sterling Pub. Co., 732 F.2d 1095, 1099 (2d Cir. 1984); see also Grand Union Co. v. Cord Meyer Dev. Co., 761 F.2d 141, 147 (2d Cir. 1985) (district court has broad discretion to "devise whatever remedy it believes in its discretion is necessary to make . . . injured parties whole"). The decision to grant or deny preliminary injunctive relief rests within the sound discretion of the trial court, and will not be disturbed on appeal absent a showing of abuse of discretion. See Arthur Guinness & Sons, 732 F.2d at 1095; see also Wallikas v. Walker, 78 F. Supp. 2d 36, 39 (S.D.N.Y. 1999) (citing JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990)).

### 2. **Private Associations**

Courts generally are reluctant to interfere with the internal decisions of organizations such as the WBA, deferring to the principle that courts are ill-equipped to resolve conflicts involving the interpretation of the organization's own rules. See generally Crouch v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 845 F.2d 397 (2d Cir. 1988) (recognizing general principle of judicial non-interference); Koszela v. Nat'l Ass'n of Stock Car Auto Racing, Inc., 646 F.2d 749 (1981) (same); see also Schulz v. U.S. Boxing Ass'n, 105 F.3d 127, 132 (3d Cir. 1997) ("[C]ourts have been understandably reluctant to interfere with the internal affairs of private associations and their reluctance

-14-

has ordinarily promoted the health of society.") (internal alterations and quotations omitted). But the Second Circuit has noted a distinction between, on the one hand, a simple challenge to an organization's allegedly erroneous interpretation and, on the other, an allegation that the organization acted in bad faith. _See, e.g._, _Crouch_, 845 F.2d at 403 ("[T]he district court should have deferred to NASCAR's interpretation of its own rules in the absence of an allegation that NASCAR acted in bad faith or in violation of any local, state or federal laws."). Put simply, a court should not intervene if it simply disagrees with what it perceives to be an unreasonable application of an organization's rules, but it may do so in response to legitimate allegations of bad faith or illegality. _See id._ at 401.

## B. **Application**

Three issues are presented. The first is whether this is the kind of dispute that a Court should be deciding. If so, the second is whether M'Baye has met the standard for a preliminary injunction. If so, the third is the scope of relief.

### 1. **Should the Court Decide This Dispute?**

The first issue is easily disposed of. M'Baye is not merely challenging the WBA's interpretation of its own rules as erroneous, nor is he simply arguing that the WBA failed to provide him with sufficient process in reaching its decision to bypass him. Rather, M'Baye argues that the WBA repeatedly granted exceptions that it knew were not contemplated by its rules because the WBA believed that it could earn more lucrative

-15-

sanctioning fees by sanctioning fights between fighters other than M'Baye. (See, e.g., Compl. ¶ 6 (alleging that the WBA bypassed M'Baye "apparently because it believe[d] that it [could] generate higher sanctioning fees on a different fight")). In other words, M'Baye alleges that the WBA acted in bad faith.

The allegation of bad faith is not without support. First, on two occasions the WBA bypassed M'Baye and sanctioned championship bouts involving fighters (Harris and Maussa) who were ranked much lower than M'Baye but who were promoted by Main Events. Second, the case of Maussa is particularly troubling, because he was unranked for several months while M'Baye was the Official Contender. After defeating a boxer with a record of 0-0, Maussa suddenly was ranked fifteenth, paving the way for him to fight Harris as the WBA then almost immediately granted an exception to allow Harris to fight Maussa rather than M'Baye. Third, although M'Baye was then entitled to fight Maussa after Maussa beat Harris, the WBA bypassed M'Baye for a third time by granting an exception to permit Maussa instead to fight Hatton. Fourth, although the WBA was able to convene a vote of its seven-member Championships Committee to grant Maussa's request to fight Hatton in just one day, the WBA took two weeks to tell M'Baye that he was being passed over and then it took some four weeks to decide M'Baye's appeal, finally denying it less than three weeks before the Maussa/Hatton bout was to take place.

Hence, M'Baye has alleged bad faith on the part of the WBA and supported his claim with concrete particulars. The

general principle of judicial non-intervention therefore does not apply. See, e.g., Crouch, 845 F.2d at 403 (explaining that district court "should have deferred to NASCAR's interpretation of its own rules in the absence of an allegation that NASCAR acted in bad faith"); Charles O. Finley & Co. v. Kuhn, 569 F.2d 527, 539 (7th Cir. 1978) (affirming district court's refusal to substitute its judgment for commissioner of baseball after district court found that commissioner acted in good faith).

### 2. Has M'Baye Met the Standard for Issuance of a Preliminary Injunction?

Moving on to the second issue, I hold that M'Baye has met the standard for the granting of a preliminary injunction. First, the irreparable nature of the harm suffered by M'Baye is self-evident. Put simply, the WBA has now passed over M'Baye on three separate occasions when he was the Official Contender. If the WBA is not required to sanction a championship fight involving M'Baye now, there is no reason to believe it would not do so again, forcing him to wait even longer for another shot at the championship. M'Baye is now thirty-one years old and the WBA's delay in giving him another opportunity to fight for a championship is surely causing him irreparable harm

Second, I conclude that, at a minimum, M'Baye has raised sufficiently serious questions going to the merits to make them fair grounds for litigation, and that he has shown that a balancing of the hardships tips decidedly in his favor.

As a starting point, an important issue in this

litigation is the proper interpretation of WBA Rule 5.1.4, which
provides:

> A rated boxer who wins the World Title in any
> division between Minimum and Cruiserweight
> . . . who has not been certified as the
> Official or Mandatory Challenger of his
> division, must defend his title against the
> Official Contender of his category within no
> more than [120] days counted from the date on
> which he obtained the title.  From then
> onwards he shall defend his title at
> intervals no longer than [9] months against
> the Official Contender, unless he is granted
> an exception according to what is stipulated
> under the Rule 19 of these Regulations."

The WBA has taken the position throughout this
litigation that its decision to allow Maussa to bypass M'Baye and
fight Hatton instead was justified by the provision in Rule 5.1.4
that allows for Rule 19 exceptions.  But the exception language
is only contained in the second sentence of the quoted portion of
Rule 5.1.4, and not the first.  This would suggest that Maussa's
defense against M'Baye -- because it was a first defense governed
by the first sentence of 5.1.4 -- was mandatory, and that he
could only apply for a Rule 19 exception for future defenses.  In
other words, M'Baye has a fair argument that if the WBA had
intended the Rule 19 exceptions to be available for situations
covered by the first sentence as well, it would have referenced
Rule 19 in the first sentence and not just in the second
sentence.  The parties offered scant evidence on this point at
the hearing; at the very least, it is a fair issue for

litigation.[8]

As noted above, if M'Baye were merely arguing that the WBA interpreted its rules erroneously, under the doctrine of judicial nonintervention the Court would be left with no option but to defer even to what it believed to be an erroneous or arbitrary interpretation.  But, as discussed above, M'Baye has introduced concrete evidence to support his assertion that the WBA acted in bad faith.  This is not simply a case of a private association incorrectly interpreting its rules.

Moreover, the balancing of hardships tips heavily in M'Baye's favor.  M'Baye has now been passed over for a title shot on three separate occasions, and he is thirty-one years old, a relatively advanced age for a professional boxer.  Any further delay would only hinder his opportunity for a title shot and increase the risk that he would lose a fight (and, hence, his ranking) in the interim, as he must engage in other bouts to make a living.

Accordingly, M'Baye has demonstrated that he is

---

[8]     See, e.g., Beletsis v. Credit Suisse First Boston Corp., No. 01 Civ. 6266 (RCC), 2002 WL 2031610, at *5 (S.D.N.Y. Sept. 4, 2002) ("The parties' intent should be discerned by reading the contract as a whole, and by considering all its clauses together to determine if and to what extent one may modify, explain or limit another."); see also Smaldone v. Senkowski, 273 F.3d 133, 137 (2d Cir. 2001) (stating general principle of statutory construction that when language is included in one section of statute but omitted in another, court must presume that the inclusion or exclusion was intentional). Although the WBA rules are not a contract, M'Baye is entitled to an expectation that the WBA will interpret its rules fairly, and it is therefore proper for the Court to consider whether certain clauses modify others when considering whether the standard for granting preliminary relief has been met.

entitled to preliminary injunctive relief.

### 3.   **What Relief Is Appropriate?**

The final question is what remedy is appropriate.  The circumstances have changed since the Court held the hearing on M'Baye's motion in late February.  At the time, Hatton was the super champion in the super lightweight class, and the WBA's position was that M'Baye should fight for the vacant regular championship, which was of greatly diminished value due to Hatton's presence as the super champion.  Hatton has now vacated his WBA super championship to fight against Collazo for the championship in a different weight class (147 pounds), leaving the super lightweight regular championship vacant with no super champion looming over it.  Furthermore, the WBA has indicated by letter to the Court that it is prepared to proceed with sanctioning a fight involving M'Baye and the next available ranked contender for the vacant championship.

Nonetheless, M'Baye is not content to fight for the WBA regular championship and instead asks the Court to enjoin the WBA from sanctioning the Hatton/Collazo welterweight fight unless Hatton agrees to return to M'Baye's weight class and fight M'Baye for the super lightweight championship no later than September 15, 2006.

This sought-after relief is too broad and unnecessarily affects the rights of Hatton and Collazo.  The gist of M'Baye's complaint and the hearing on the preliminary injunction was that the WBA has passed over M'Baye on numerous occasions when under

its rules he rightfully should have had the opportunity to fight for the championship in his weight class.  When Maussa was allowed to fight Hatton with the result being that Hatton was crowned a super champion, M'Baye had a legitimate claim that a fight for the vacant regular championship was of greatly diminished value due to the presence of Hatton.  Now that Hatton has vacated, it would appear that the remedy that comes the closest to making M'Baye whole is to order the WBA to refrain from sanctioning any bout for the vacant regular championship -- or any super championship -- in the super lightweight division unless it involves M'Baye.

## CONCLUSION

Accordingly, it is hereby ORDERED as follows:

1.    The WBA is enjoined from sanctioning any bout for the currently vacant WBA regular championship (or super championship) in the super lightweight (140-pound) division unless the bout involves M'Baye, unless M'Baye is offered the fight and declines; and

2.    The preliminary injunction that had been in place enjoining the WBA from sanctioning any bout between the winner of the Hatton/Maussa fight and any fighter other than M'Baye is vacated.  The WBA is permitted, if it so wishes, to sanction as a

welterweight championship match the bout between Hatton and
Collazo.

     SO ORDERED.

Dated:    New York, New York
         May 5, 2006

DENNY CHIN
United States District Judge

Attorneys for Plaintiff:

       JUDD BURSTEIN, P.C.
           By:  Judd Burstein, Esq.
               Peter B. Schalk, Esq.
       1790 Broadway, Suite 1501
       New York, NY  10019

Attorneys for Defendant:

       SMITH ALLING LANE, P.S.
           By:  Robert E. Mack, Esq.
               Michael A. McAleenan, Esq.
       1102 Broadway Plaza, #403
       Tacoma, WA  98402

             -- and --

       McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
           By:  Brian J. Carey, Esq.
               I. Michael Bayda, Esq.
               Jay A. Katz, Esq.
       Wall Street Plaza
       88 Pine Street, 24th Floor
       New York, NY  10005